**AMERIWOOD INDUSTRIES INTERNATIONAL CORPORATION, f/k/a Rospatch Corporation, a Michigan corporation, Plaintiff,**

v.

**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, a Pennsylvania corporation, Defendant.**

No. 1:92–CV–658.

United States District Court,
W.D. Michigan, S.D.

Dec. 10, 1993.

Gregory L. Curtner, Miller, Canfield, Paddock & Stone, Detroit, MI, for plaintiff.

Charles H. Worsfold, Cholette, Perkins & Buchanan, Grand Rapids, MI, Peter D. Sullivan, Thomas S. Malciauskas, Kevin W. Bruning, Hinshaw & Culbertson, Chicago, IL, for defendant.

### OPINION RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HILLMAN, Senior District Judge.

#### I. INTRODUCTION

In this case plaintiff Ameriwood Industries International Corporation, f/k/a Rospatch Corporation ("Rospatch") seeks to recover under two consecutive directors' and officers' liability policies (D & O policies) issued by defendant American Casualty Company of Reading ("American Casualty"). The first policy was issued on October 10, 1988, (the "88/89 policy") and the second on October 10, 1989, (the "89/90 policy").

Rospatch is now moving for summary judgment as to American Casualty's liability on each count of a three-count complaint. American Casualty denies liability on each count, and, in the alternative, asserts that the motion raises questions of fact which cannot be resolved on summary judgment.

Rospatch's complaint in Count I seeks a declaratory judgment that coverage is afforded under the terms of defendant's policies for certain losses sustained by Rospatch in defending and settling several lawsuits filed against Rospatch and its officers and di-

rectors. Count II alleges that American Casualty breached the D & O policies by failing to indemnify Rospatch for the losses alleged in Count I. Count III is a claim against American Casualty for interest under the Michigan Uniform Trade Practices Act. American Casualty filed an answer to the complaint denying any liability to Rospatch and raising a number of affirmative defenses.

Rospatch contends that it suffered losses covered by the D & O policies as a result of several underlying lawsuits. The filing dates, names, and final dispositions of these underlying suits are as follows:

| Date Filed | Name of Action and Final Disposition |
| --- | --- |
| February 19, 1988 | Atlantis Group, Inc. v. Rospatch Corp., Case No. G88–113 CA1 (W.D.Mich.) ("First Atlantis action"). |
| | Rospatch makes no claim for coverage of this case, but its filing date and subject matter are relevant to coverage of the Kent County action, listed below; |
| April 21, 1988 | Alizac Partners and Atlantis Group, Inc. v. Rospatch, Case No. G88–311 CA1 (W.D.Mich.) ("Alizac action" or "Alizac"). |
| | Judgment of no cause of action against Alizac and Atlantis, Alizac Partners v. Rospatch, 712 F.Supp. 599 (W.D.Mich. 1989); |
| March 10, 1989 | Atlantis Group, Inc. v. Rospatch Corporation, Case No. 89–61298–CZ, Circuit Court, Kent County, Mich. ("Kent County action"). |
| | Dismissed for want of prosecution; |
| March 14, 1990 | Atlantis Group, Inc. v. Rospatch Corporation, Case No. 90–0697 (S.D.Fla.) transferred to W.D.Mich. and assigned Case No. 1:90–CV–805 ("Atlantis fraud lawsuit"). |
| | Settled; |
| April 3, 1990 | Plato Paper v. Rospatch Corporation, Case No. 90–0697 (S.D.Fla.) transferred to W.D.Mich. and assigned Case No. 1–90–CV–806 ("*Plato Paper*") |
| | Consolidated with *Freberg* and settled; |
| April 27, 1990 | Atcovitz v. Beadle, Case No. 90–1044 (S.D.Fla.), transferred to W.D.Mich. and assigned Case No. 1:90–CV–807 ("*Atcovitz*") |
| | Dismissed; |
| January 22, 1991 | Freberg v. Rospatch Corporation, Case No. 1:91–CV–85 (W.D.Mich.) ("*Freberg*") |
| | Consolidated with *Plato Paper* and settled. |

Rospatch has claimed coverage under the first of the two policies (the "88/89 policy") for the defense costs of Count II of the second amended complaint in *Alizac* and of the Kent County action. In addition, Rospatch contends that some, but not all, of the claims in the "Atlantis fraud lawsuit," *Atcovitz, Plato Paper* and *Freberg* (the "Four

Fraud Lawsuits"), were the same as the claims made in Count II of the second amended complaint in the Alizac action and in the Kent County action. As such, Rospatch asserts, those claims were also covered under the 88/89 policy even though the suits in which they were made were filed after the expiration of that policy. American Casualty, on the other hand, denies that Rospatch may obtain coverage under the 88/89 policy for claims made in the Four Fraud Suits, which were filed in the second year. In addition, it denies liability for coverage of any portion of the Alizac action and the Kent County action pursuant to the prior litigation and prior notice exclusions.

Under the second policy (the "89/90 policy"), Rospatch claims coverage for those claims made in the Four Fraud Suits that are not, under Rospatch's "relation back" theory just described, covered under the 88/89 policy. American Casualty denies liability for these claims on three grounds. First, it asserts that they are excluded from coverage under the Atlantis exclusion to the policy, which excepts any legal claims made against Rospatch officers or directors "by or on behalf of" the Atlantis Group or the Alizac Partners. Second, it cites the Securities Acquisition exclusion, which precludes coverage of any claim made against Rospatch officers or directors based on either third party attempts to acquire Rospatch securities in the face of opposition by Rospatch or its officers or directors, or attempts by Rospatch or its officers or directors to prevent such acquisition. Third, American Casualty claims that Rospatch failed to satisfy a prerequisite for coverage under Insuring Clause (b) of the policies, in that it neither did nor was required to indemnify its directors and officers.

Finally, Rospatch seeks a ruling that all of its expenditures in the defense and settlements of the underlying lawsuits are allocable as a matter of law to the individual directors and officers covered under the policies, and the claims covered by the policies. As a result, Rospatch claims, all of the expenditures must be paid by American Casualty. American Casualty maintains that the allocation issue raises factual questions which cannot be decided on summary judgment.

Having reviewed all of the evidence submitted, I conclude that Rospatch is not entitled to summary judgment under the 88/89 policy. Further, I conclude that questions of fact related to Rospatch's indemnification of its directors preclude summary judgment as to liability under the 89/90 policy. Finally, the allocation of Rospatch's disbursements, I find, is a question of fact and an issue more appropriate for decision at the damages stage of this lawsuit. Therefore determination of the allocation questions raised in this motion is deferred.

## II. UNDERLYING LAWSUITS

The lawsuits underlying Rospatch's claims are more fully described as follows:

### "Alizac Action"

This suit was originally filed in this court on April 21, 1988, by Alizac Partners and Atlantis Group, Inc., both shareholders of Rospatch, against Rospatch and certain of its officers and directors. They alleged that the officers and directors had made unlawful omissions in Rospatch's proxy materials relating to communications with a shareholder regarding a proposed leveraged buyout of Rospatch and with the trustee of Rospatch's employee stock option plan. The second amended complaint in the case, dated February 13, 1989, alleged that the officers and directors. had misrepresented the financial condition and operations of Rospatch's Technical Products Group to a different shareholder. Injunctive and other appropriate relief was sought. Following a non-jury trial, judgment of no cause for action was entered by this Court against plaintiffs Alizac and the Atlantis Group on May 4, 1989. *Alizac Partners v. Rospatch*, 712 F.Supp. 599 (W.D.Mich.1989).

### "Kent County Action"

The plaintiffs in this case, filed on March 10, 1985, in the Michigan State Circuit Court, alleged that Rospatch's Board of Directors violated Michigan law and breached fiduciary duties by adopting the "Poison Pill," a shareholder rights agreement which would automatically augment the rights of other Rospatch shareholders upon the accumulation by

any one shareholder of 20% or more of Rospatch's outstanding stock. The plaintiffs further alleged that the directors violated Michigan law and wasted corporate assets by causing Rospatch to enter into certain officer and director compensation and employment agreements ("Golden Parachutes"). The case was dismissed for want of prosecution on January 22, 1992. *Atlantis Group, Inc. v. Rospatch Corporation*, Case No. 89–61298–CZ (Cir.Ct.County of Kent 1992) (dismissal order for lack of progress).

### "Atlantis Fraud Lawsuit"

Plaintiff Atlantis Group claimed in this action that Rospatch directors and officers had breached their fiduciary duties 1) by adopting the Poison Pill and Golden Parachutes, and 2) by overstating the net worth and future prospects of its Technical Products Group ("TPG"). Plaintiffs made additional claims for self-dealing, violation of federal and state securities laws, negligent misrepresentation, constructive fraud, fraudulent concealment, and criminal racketeering. A settlement agreement was reached with regard to all of the claims, pursuant to which Rospatch repurchased shares of its stock from Atlantis Group for $10,132,500.

### "Plato Paper" and "Freberg"

"Plato Paper" was a class action brought on behalf of all who purchased common stock of Rospatch between March 30, 1987 and March 14, 1990. The class alleged fraud, negligent misrepresentation and fraudulent concealment by various Rospatch officers and directors and counsel for Rospatch, stemming from misstatements in the April 1988 proxy materials and other public documents and financial statements. The *Freberg* case made the same allegations, and the two cases were consolidated. The consolidated action ("Consolidated Class Action") was settled in a Stipulation to Class Action Settlement, pursuant to which Rospatch paid $5,500,000 into a fund for the benefit of the class.

### "Atcovitz"

This was a shareholder derivative action against Rospatch and various of its directors and officers. The suit alleged breach of fidu-

ciary duties by means of the Poison Pill and Golden Parachutes, breach of fiduciary duties and violation of securities laws by misrepresentation of financial conditions and operations in the April 1988 proxy materials and other public documents and financial statements and self-dealing and corporate waste. *Atcovitz* was dismissed on August 27, 1991.

### Costs Claimed by Rospatch

Rospatch totals its costs at $15,623,500 for the settlements of the Atlantis fraud suit and the Consolidated Class Action. Subtraction of the fair market value of the shares Rospatch received from Atlantis pursuant to the first settlement reduces the total to $8,161,000. In addition, Rospatch claims it has incurred a debt of $7,100,000 for the defense of all of its claims under these two policies. Thus, its total claims under the policies equal $15,261,000.

## III. D & O POLICIES

Rospatch purchased two D & O policies from the defendant. The 88/89 policy was issued for the period from October 10, 1988 to October 10, 1989. The 89/90 policy was issued for the next year, October 10, 1989 through October 10, 1990. The liability limit under each policy was $5,000,000, subject to a $500,000 retention for each loss. With its claims of over $15,000,000 in damages, Rospatch is seeking to recover the full $5,000,000 under each policy. American Casualty denies any liability under either policy.

The policies were written on a "claims made" basis, such that each covers all claims made during the period the policy was in effect, subject to various exclusions and endorsements in addition to the $500,000 retention for each loss. "Claims made" insurance policies, as opposed to occurrence-based policies, are intended by insurers to avoid the "hazard of an indefinite future: Once the policy period has expired, the book can be closed on everything except then-pending claims." *Nat'l Union Fire Ins. Company v. Continental Illinois Corp.*, 673 F.Supp. 300, 304 (N.D.Ill.1987). *See also*, George L. Priest, The Current Insurance Crisis and Modern Tort Law, 96 Y.L.J. 1521, 1575

(1987) (discussing the theory behind claims made policies). On the other hand, an insurer incurs a risk with this kind of policy: liability for "a claim that has been brewing and was ripe to erupt before the policy period, but is asserted only after the policy period begins." *Nat'l Union*, 673 F.Supp. at 304. For this reason, claims made policies generally include a number of endorsements and exclusions intended to limit this front end risk by cutting off liability for claims ready, but not yet made, at the start of the policy period. *See*, Dennis J. Block and Nancy E. Barton, Indemnification and Insurance of Corporate Officials, 578 P.L.I. Order No. A4–4341 (May–June 1991) (available on Westlaw).

### The Insuring Clauses

The D & O policies each contain two insuring clauses, (a) and (b). Rospatch asserts coverage under Clause (b), in which American Casualty agreed:

With the Company that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Company, all Loss for which the Company is required to indemnify or for which the Company has, to the extent permitted by law, indemnified the Directors and Officers.

To establish liability under Clause (b), therefore, Rospatch must prove:

1. That a claim was made against Rospatch's officers and directors during the policy period;

2. That the claim was for a "Wrongful Act," as defined in the D & O policies; and

3. That there was a "Loss," as defined in the policies, for which:

(a) Rospatch is required to indemnify its directors and officers, or

(b) Rospatch has, to the extent permitted by law, indemnified its directors and officers.

In this case, the parties disagree over whether or not claims were in fact made against Rospatch's officers and directors during the policy periods; they disagree as to the indemnification requirement of the Loss element; and finally, they differ as to the applicability of various exclusions in the policies to the claims made.

### Determination of When a Claim is Made.

Clause 4(b) of the policies, as amended by endorsement, sets forth that a claim is made "at the date notice is given to the Insurer pursuant to Clause 6(a) or 6(b), or at the date a suit is brought against the Directors and Officers, whichever shall occur first."

Notice may be properly given under the policies in one of two ways. Clause 6(a) provides that: .

If during the policy period the Company or the Directors or Officers shall

(i) receive written or oral notice from any party that it is the intention of such party to hold the Directors or Officers, or any of them, responsible for a Wrongful Act, or

(ii) become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and Officers, or any of them, for a Wrongful Act and

shall, during such period, give written notice thereof to the insurer as soon as practicable and prior to the date of termination of the policy, then any claim which may subsequently be made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of the policy, be treated as a claim made during the policy year in which such notice was given.

Clause 6(b) provides that

The Company or the Directors or Officers shall, as a condition precedent to their rights under this policy, give to the Insurer notice in writing as soon as practicable of any claims made and shall give the Insurer such information and cooperation as it may reasonable require.

Thus, under these policies, a claim is made on the date suit is brought against an officer or director, or on the date notice is given, whichever comes first. A claim is deemed to

be made when notice is given only if: 1) Rospatch receives written or oral notice from any party that it is the intention of the party to hold the directors or officers responsible for a Wrongful Act, *or* becomes aware of an occurrence which may subsequently give rise to a claim being made against the directors and officers for a wrongful act, *and* 2) Rospatch gives written notice of the above to American Casualty within the policy period. If both requirements are met, then "any claim which may subsequently be made against the Directors and Officers arising out of such Wrongful Act shall, for the purposes of this policy, be treated as a claim made during the policy year in which such notice is given." Clause 6(a).

These provisions concerning the timing of claims are central to the disputes between Rospatch and American Casualty as to the timing of the second amended *Alizac* complaint, and as to when the claims in the Four Fraud Suits were brought, and under which, if either, policy they are covered.

### Definitions of "Wrongful Act" and "Loss"

The term "Wrongful Act" is defined in Clause 1(e) of the policies as:

> any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by the Directors or Officers in the discharge of their duties solely in their capacity as Directors or Officers of the Company, individually or collectively, or any matter claimed against them solely by reason of their being Directors or Officers of the Company.

Neither Rospatch nor American Casualty appears to dispute that the underlying lawsuits were brought against Rospatch officers and directors for Wrongful Acts. Thus there is no need to discuss the application of this policy requirement.

"Loss" is defined in Clause 1(d) of the policies as:

> any amount which the Directors and Officers are legally obligated to pay or for which the Company is required to indemnify the Directors or Officers or for which the Company has, to the extent permitted by law, indemnified the Directors and Officers, for a claim or claims made against

the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements, costs (exclusive of salaries of officers or employees), and defense of legal actions, claims or proceedings and appeals therefrom, and cost of attachment or similar bonds; provided however, such Loss shall not include fines or penalties imposed by law or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Rospatch and American Casualty disagree as to the extent to which Rospatch's various claimed costs are covered under the policies. In addition, American Casualty contends that Rospatch suffered no Losses, as defined in the policies, because it neither did, nor was required to indemnify its officers and directors named in the underlying suits.

### Relevant Exclusions and Endorsements

Litigation against Rospatch prior or pending as of October 10, 1988 is excluded from coverage under the policies, as are claims which were the subject of prior notice to an insurer.

The 89/90 policy includes two exclusions which were not part of the 88/89 policy. The "Securities Acquisition Exclusion" excludes coverage for (i) any claims based upon or attributable to any attempts by persons to acquire Rospatch stock against the opposition of Rospatch or its directors and/or (ii) any claims based upon efforts of Rospatch and/or its directors to resist an attempt by a third party to acquire securities of Rospatch. The "Atlantis Exclusion" excludes coverage for any claims made against the directors or officers brought by or on behalf of Atlantis or Alizac Partners.

The parties to this suit disagree as to the applicability of the Prior or Pending Litigation exclusion to Rospatch's claims under the first policy, and as to whether the other exclusions apply under the 89/90 policy.

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court must decide on a summary judgment motion "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In making this determination, the court must examine the record as a whole by reviewing all pleadings, affidavits and other admissions on file, drawing all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 153–54 (6th Cir.1990). If the moving party demonstrates an absence of evidence in support of the nonmoving party's case, the nonmoving party must come forward with specific facts to support its claims and show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56. Mere allegations in support of the nonmoving party's case are inadequate; the "mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].

### Standard for Construction of an Insurance Contract

▋ Federal jurisdiction in this case is based on diversity of citizenship; therefore, Michigan law governs substantive issues, while federal law governs procedural matters. *F.L. Aerospace v. Aetna Casualty & Surety Co.*, 897 F.2d 214, 217 (6th Cir.), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990).

▋ The Michigan Supreme Court has recognized that an insurance contract is a contract of adhesion rather than "a hard-bargained contract drafted after mutual consideration of the positions of two negotiators with equal or substantially equal skills and resources." *Inland Waters Pollution Control, Inc. v. National Union Fire Insurance Company*, 997 F.2d 172, 181 (6th Cir.1993), citing *Powers v. Detroit Auto. Inter–Insurance Exchange*, 427 Mich. 602, 608, 398 N.W.2d 411, 413 (1986). Ambiguity in the language of an insurance contract, therefore, should be construed in favor of the insured. *Id.*, citing, *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 665, 443 N.W.2d at 739 (1989); *see also, Couch on Insurance 2d*, § 44A:3 at 7 (1981 and Supp.1993); Appleman, *Insurance Law and Practice* § 4491.01 (1987 and Supp. 1992). In construing liability insurance policies, courts have generally tended "to expand coverage beyond the literal meaning of the ... policies." Appleman, § 4491.01 at 14. Where the terms of an insurance contract are clear as written, however, they must be enforced as written. *Allstate*, 432 Mich. at 665, 443 N.W.2d at 739. "Construction of an insurance contract containing unambiguous language is a question of law for the court." *Id.*, quoting, *Jones v. Farm Bureau Mut. Ins. Co.*, 172 Mich.App. 24, 27, 431 N.W.2d 242, 244 (1988).

### V. COVERAGE UNDER THE 88/89 POLICY

Under the 88/89 policy, Rospatch claims coverage of its costs in defending Count II of the second amended complaint in the "Alizac action" and the "Kent County action." In addition, it claims coverage of certain claims made against Rospatch directors as part of *Plato Paper* and *Freberg* (the "Consolidated Class Action") and *Atcovitz*. American Casualty contends that Count II of the second amended complaint in *Alizac* and the "Kent County action" are excluded from coverage because of the policy dates as well as certain exclusions. With respect to the portions of the "Consolidated Class Action" and *Atcovitz* for which Rospatch is claiming coverage under the 88/89 policy, American Casualty maintains that Rospatch under the 88/89 policy may not obtain coverage for claims made against its officers and directors as part of lawsuits brought during the 89/90 policy.

Having considered all of the evidence, I conclude that Rospatch is not entitled to summary judgment as to any of its claims under the 88/89 policy, and that no coverage exists for Rospatch under the 88/89 policy as a matter of law.

### Alizac Action

First, Rospatch claims coverage under the 88/89 policy for the defense costs of Count II of the second amended complaint in Alizac. American Casualty counters that this claim is excluded from coverage both because it was a claim made prior to the inception of the 88/89 policy, and because it was covered by the prior litigation exclusion to the policy.

■ The Alizac action was originally filed on April 21, 1988. The second amended complaint in that action was filed on February 12, 1989. The 88/89 policy was in effect from October 10, 1988 through October 10, 1989, by its language covering only claims made "during the policy period." Insuring Clauses (a), (b). As explained above, a claim to be successfully made under the 88/89 policy arose when a suit was brought against Rospatch officers and directors, or when notice was provided to American Casualty, whichever came first. A suit begins in federal court with the filing of a complaint. Wright and Miller, *Federal Practice and Procedure,* § 1052 (1992 and 1993 Supp.) After the original filing, the suit is considered to be pending. *Id.* Thus the amendment of the *Alizac* complaint within the policy period does not constitute a new filing of the case.

Because the Alizac action was originally brought on April 21, 1988, without any prior notice to American Casualty, it was a "claim made" on April 21, 1988, prior to the inception of the 88/89 policy. Consequently, the Alizac action, including its second amended complaint, is not covered under the 88/89 policy.

■ Even were the second amended complaint in *Alizac* not excluded from coverage, Count II of the second amended complaint would be excluded under the Prior or Pending Litigation endorsement of the 88/89 policy. This endorsement excludes claims

made against the Directors or Officers based upon or attributable to litigation prior to or pending at the inception date of this policy ... or arising out of the facts or circumstances underlying or alleged in any such prior or pending litigation.

The original complaint in the Alizac action alleged that Rospatch officers and directors violated federal securities laws by distributing written proxy literature which omitted material facts that had been disclosed orally by the directors to certain selected shareholders. The complaint alleged that as a result of this disclosure by the directors, either the information in the proxy materials or the representations to the selected shareholders was false and misleading. *Alizac Partners and Atlantis Group, Inc. v. Rospatch Corp.,* Complaint ¶¶ 16–19. Count II of the second amended complaint in *Alizac* makes the same allegation. It, however, names for the first time the Day Trust as a selected shareholder to whom oral representations had been made. Rospatch argues that Count II of the second amended complaint in *Alizac* alleges wrongs distinct from those raised in the original and first amended complaints. Consequently, according to Rospatch, it should therefore be considered a separate claim.

Even if the naming of a new target of allegedly unlawful proxy solicitation in Count II were to differentiate the second amended complaint from the original complaint in *Alizac,* the second amended complaint, including Count II, is undeniably "based upon or attributable to" the lawsuit of which it is part. Because *Alizac* was filed on April 21, 1988, it was "prior to or pending at" the beginning of the 88/89 policy in October, 1988. Therefore, Count II of the second amended complaint in *Alizac* falls squarely under the Prior or Pending litigation endorsement, and is not covered under the 88/89 policy.

### Kent County Action

■ Rospatch's next claim under the 88/89 policy is for coverage of the Kent County action. American Casualty denies this coverage based on the Prior Litigation exclusion.

The Kent County action alleged that Rospatch directors, by adopting the "Poison Pill," which automatically diluted the voting power of any Rospatch shareholder who became the beneficial owner of more than 20% of Rospatch's stock, wrongfully prevented Atlantis Group, Inc., from freely acquiring Rospatch stock. The plaintiffs, Atlantis Group, Inc., alleged that the adoption of the Poison Pill violated a number of statutory and common law rules. *Atlantis Group, Inc. v. Rospatch Corp.*, Case No. 89–61298–CZ, Cir.Ct., Kent Co., Complaint at ¶ 20. An earlier case, filed by the Atlantis Group in February, 1988, had alleged the same statutory and common law wrongs in connection with the Poison Pill. *Atlantis Group, Inc. v. Rospatch Corp.*, Case No. G–88–113–CA1 (W.D.Mich.), Complaint at ¶¶ 8–25 ("First Atlantis action"). The complaint in the First Atlantis action alleged that the Poison Pill would be triggered by a voting agreement between Atlantis and the Alizac Partners, who together owned more than 20% of Rospatch stock. The result would be an unlawful restriction on the voting agreement. Although both harms allegedly resulted from Rospatch directors' implementation of the Poison Pill, this voting agreement restriction is a wrongful result distinguishable from the prevention of stock acquisition alleged in the subsequent "Kent County action."

American Casualty's position is that because the same wrongful acts by Rospatch directors were alleged in the First Atlantis suit and the Kent County action, the latter "[arose] out of the facts or circumstances underlying or alleged in" the former. Because the First Atlantis action, dismissed in March, 1988, was "prior to" the inception date of the 88/89 policy, American Casualty claims, the Kent County action is excluded from coverage under the Prior Litigation endorsement to the policy.

Rospatch asserts that the different harms alleged in the two suits prevent the Kent County action from "arising out of the facts or circumstances underlying or alleged" in the First Atlantis suit, and that therefore the Kent County action is not excluded under the Prior Litigation endorsement. The cases cited by Rospatch in support of this position,

however, are inapposite. Principally, the cited cases involve the construction and application of notice and Loss provisions in the policies at issue, rather than prior litigation exclusions like the one at issue here. *See, Helfand v. National Union Fire Insurance Company*, 10 Cal.App.4th 869, 13 Cal.Rptr.2d 295 (1992); *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 369 (7th Cir.1990); *Colbert County Hospital Board v. Bellefonte Ins. Co.*, 725 F.2d 651, 654 (11th Cir.1984). In *National Union Fire Ins. Co. v. Ambassador Group*, 691 F.Supp. 618 (E.D.N.Y. 1988), the other case cited by Rospatch, the court considered whether two claims made after the termination of a D & O policy involved the "same or interrelated acts" as earlier claims brought within the policy year. The court held that claims brought by different plaintiffs alleging distinct legal wrongs to separate people were not based upon the "same or interrelated acts." *Ambassador Group*, 691 F.Supp. at 623.

In this case, however, the plaintiff in both cases is the same, and the legal wrongs alleged in the Kent County action are the same as those asserted in the First Atlantis action. The First Atlantis action was brought by Atlantis Group, as was the Kent County action, and both cases alleged the same wrongful acts by the defendants and the same legal violations. The only significant difference between the two complaints, concerning the Poison Pill, was in the nature of the harmful *effect* the Pill had on the Atlantis Group. Therefore, it is clear that the Kent County action "[arose] out of the facts or circumstances underlying or alleged in" the earlier suit.

For these reasons, Rospatch is denied summary judgment as to coverage of the Kent County action, and I conclude that as a matter of law, no coverage exists for the action under the 88/89 policy.

### Four Fraud Suits

■ Rospatch's final claim under the 88/89 policy is that some, but not all, of the claims in the Four Fraud suits were the same as the claims made in Count II of the second amended complaint in the Alizac action (case filed April 21, 1988, amended on February

12, 1989) and in the Kent County action (filed March 10, 1989). Although the Four Fraud suits were all filed after the end of the 88/89 policy, Rospatch asserts, they should be covered under the 88/89 policy because of their similarity to the second amended complaint in *Alizac* and to the Kent County action. (The "Atlantis Fraud lawsuit" was filed March 14, 1990; *Plato Paper* on April 3, 1990; *Atcovitz* was filed April 27, 1990; and *Freberg* on January 22, 1991).

Specifically, Rospatch contends that those claims made in the Four Fraud suits alleging misrepresentations by Rospatch directors concerning the Technical Products Group were the same as the misrepresentation claims made in Count II of the second amended complaint in *Alizac*. Claims made in three of the Four Fraud suits related to Rospatch directors' adoption of the Poison Pill and the Golden Parachutes agreements, Rospatch asserts, were the same as the claims made in the Kent County action concerning those two initiatives by the Directors. Having first been made during the 88/89 policy year, Rospatch argues, those claims as reasserted in the complaints in the Four Fraud suits, filed in 1990 or later, should be carried back to the 88/89 policy and covered under it.

American Casualty contends that Rospatch may not receive coverage under the 88/89 policy for claims made as part of lawsuits filed during the 89/90 policy. Even if such a relation back were possible under the notice and timing provisions of the policy, American Casualty maintains, the claims made in the Four Fraud lawsuits were sufficiently different in substance and relief sought that they would not "relate back" to Count II of the second amended complaint in *Alizac* and to the Kent County action.

A claim was made under the policy whenever suit was brought against the officers and directors, or whenever Rospatch notified American Casualty of a claim against it, whichever came first. American Casualty argues that because Rospatch did not provide it with notice during the 88/89 policy year of the claims against its directors and officers during the 89/90 year as part of the Four Fraud suits, those claims cannot be covered under the 88/89 policy year. In addition, American Casualty argues, the allegations in the Four Fraud Suits could not have been "first made during the 1988–1989 policy year," as Rospatch maintains, because they are not sufficiently similar to the claims made in *Alizac* and the Kent County action. Were the claims in the Four Fraud suits similar enough to the *Alizac* and Kent County claims to relate back in the way Rospatch proposes, American Casualty holds, then the second amended complaint in *Alizac* and the Kent County action would themselves relate back to the original complaint in *Alizac* and to the First Atlantis action, respectively, and they themselves would be excluded from coverage.

Because I have concluded that the *Alizac* and Kent County claims are excluded from coverage under the 88/89 policy under the Prior Litigation endorsement, there is no need for me to decide the validity of Rospatch's relation back theory and its application to the claims in the Four Fraud suits. Even if the Four Fraud suits claims could relate back as Rospatch advocates, without the *Alizac* and Kent County claims under the 88/89 policy, they have nothing to relate back to.

For these reasons, summary judgment as to American Casualty's liability for Rospatch's costs connected with Count II of the second amended complaint in *Alizac* and of the "Kent County action" is denied. Additionally, the demand for summary judgment as to the portions of the Four Fraud lawsuits claimed to be covered under the 88/89 policy is denied. As a matter of law, there is no coverage for any of these claims under the 88/89 policy.

### VI. COVERAGE UNDER THE 89/90 POLICY

Rospatch claims coverage under the 89/90 policy for additional claims made in the Four Fraud suits which were not sufficiently similar to claims allegedly made under the 88/89 policy, under Rospatch's theory, to relate back and be covered under the earlier policy. These additional claims principally involved allegations of self-dealing and corporate waste, of misrepresentations in public docu-

ments other than the April 1988 proxy materials, and of common law fraud and negligent misrepresentation.

American Casualty raises three objections to coverage of these claims under the 89/90 policy. First, it alleges that the Atlantis exclusion of the 89/90 policy operates to prevent coverage of the claims. Second, it maintains that the Securities Acquisition endorsement in the policy precludes recovery. Finally, American Casualty holds that Rospatch failed to properly indemnify its officers and directors who were covered under the policy and that therefore it can receive no coverage under the policy. I will address each of these objections in turn.

#### Atlantis Exclusion

 The Atlantis exclusion to the 89/90 policy exempts American Casualty from liability for:

> Loss in connection with any claim made against the Directors or Officers brought by or on behalf of Alizac Partners, Atlantis Group, Inc. and/or any of their subsidiaries.

In drafting the 89/90 policy, American Casualty was aware that the Alizac action and the Kent County action had been filed against Rospatch by Alizac and the Atlantis group. The Atlantis exclusion was intended to exclude from coverage "any claims having anything to do with Atlantis Group, Inc. or Alizac Partners." Affidavit of Todd Weber at ¶ 7. American Casualty now holds that this provision excludes from coverage the Atlantis fraud lawsuit as well as that portion of Rospatch's expenses in connection with the Consolidated Class Action settlement which were attributable to the Alizac Partners' membership in the plaintiff class in that suit.

Rospatch concedes that this provision prevents coverage of the Atlantis fraud suit under the 89/90 policy, because the Atlantis Group was the plaintiff in that suit. Rospatch maintains that the Consolidated Class Action, on the other hand, presents a different question. In that case the Alizac Partners was one of many members of a plaintiff class. Although the Atlantis endorsement in the 89/90 policy excludes from coverage loss connected with a claim made "by or on behalf of" the Alizac Partners as well as the Atlantis Group, Rospatch asserts, the Alizac Partners represented such a small portion of the plaintiff class as a whole that the exclusion should not apply to the Consolidated Class Action. Rospatch holds, in particular, that because Alizac's share of the class settlement was minimal, Rospatch should recover its total settlement disbursements from American Casualty. Rospatch further asserts that because Alizac's membership in the plaintiff class did not raise the defense costs of the Consolidated Class Action, the defense costs for the suit should be fully covered under the policy as well.

These assertions raise questions of fact as to the allocation of Rospatch's settlement disbursements and defense costs in the Consolidated Class Action. What portion of the settlement actually went to Alizac Partners, and what percentage of Rospatch's defense costs are attributable to the membership of Alizac Partners in the plaintiff class, for example, are questions that depend upon facts not before the court. As I am thus unable to decide these allocation issues as a matter of law, summary judgment on this question must be denied. *See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 367 (7th Cir.1990); *Nodaway Valley Bank v. Continental Cas. Co.*, 715 F.Supp. 1458, 1459 (W.D.Mo.1989); *see infra,* discussion of allocation issue. Therefore, summary judgment on the basis of the Atlantis exclusion with respect to coverage of the Consolidated Class Action is denied.

 As for the *Atcovitz* case, the Atlantis exclusion does not apply. The Atlantis endorsement to the 89/90 policy excludes only losses connected with claims made against Rospatch officers or directors "by or on behalf of" either the Atlantis Group or Alizac Partners. *Atcovitz* was a derivative suit brought by two individual shareholders; neither the Atlantis Group nor Alizac Partners were plaintiffs. Thus, the Atlantis exclusion is inapplicable to Rospatch's claim for coverage of its costs associated with the *Atcovitz* case.

Therefore, in sum, the Atlantis exclusion, as a matter of law, prevents recovery by

Rospatch under the 89/90 policy for any losses related to the Atlantis fraud suit. Fact questions arising under this exclusion concerning allocation of Rospatch's expenses related to the Consolidated Class Action are reserved, and summary judgment as to that claim is denied. Finally, because the Atlantis exclusion is inapplicable to Rospatch's claim for coverage of the *Atcovitz* case, the exclusion does not prevent coverage of that claim.

### Securities Acquisition Exclusion

 The Securities Acquisition exclusion to the 89/90 policy protects American Casualty from liability for:

> Loss in connection with any claim made against the Directors or Officers based upon or attributable to: any attempts, whether alleged or actual, successful or unsuccessful, by persons or entities to acquire securities of the Company against the opposition of the company and/or the Directors of the Company, or to any claims arising from, attributable to or involving efforts, whether alleged or actual, successful or unsuccessful, by the Company and/or its Directors to resist such attempts.

American Casualty maintains that this exclusion bars coverage for the Four Fraud suits under the 89/90 policy. The exclusion was written for the purpose of excluding coverage for "(i) any claims based upon or attributable to attempts by any third party to acquire stock of Rospatch and/or (ii) any claims based upon or attributable to any actions of Rospatch's officers or directors to resist such attempts." Affidavit of Todd Weber at ¶ 7. *Plato Paper, Freberg* and *Atcovitz,* American Casualty argues, were brought to challenge various actions taken by Rospatch's officers and directors to prevent the purchase of its securities. The Defendant quotes numerous allegations from the complaints in those cases that Rospatch's directors and officers engaged in a variety of wrongful acts in order to maintain "control of Rospatch" and to prevent third parties from "acquiring control of Rospatch."

Rospatch maintains that these allegations that its officers and directors were attempting to prevent third parties from gaining *control* over Rospatch are not covered by the exclusion. The exclusion bars claims "based upon or attributable to" attempts to acquire Rospatch *securities* or efforts by Rospatch directors or officers "to resist such attempts." Endorsement 17, 89/90 Policy. Rospatch's position is that Rospatch's shareholders, in making the allegations quoted above, were challenging efforts by Rospatch's directors and officers to prevent them from obtaining control of Rospatch, which they were in fact attempting to do, but not by means of acquiring its securities. It points out that Atlantis Group was not at the time of the 1990 suits trying to acquire Rospatch securities, because the Poison Pill had made the acquisition of securities "fruitless and expensive." Oral Argument at p. 70, 1. 23. Rather, Atlantis Group was attempting to obtain control over Rospatch by other means such as election of directors and litigation. American Casualty does not dispute that Atlantis was not attempting to purchase securities at the time of the 89/90 policy.

 The general rule is that exclusions in insurance contracts must be drafted precisely. *Fragner v. Am. Community Mut. Ins. Co.,* 199 Mich.App. 537, 502 N.W.2d 350, 352 (1993), citing, *Transamerica Ins. Corp. of America v. Buckley,* 169 Mich.App. 540, 426 N.W.2d 696 (1988). Exclusionary clauses must also be strictly construed against the insurer. *Id.,* citing, *Farm Bureau Mutual Ins. Co. of Michigan v. Stark,* 437 Mich. 175, 181, 468 N.W.2d 498 (1991). Thus, where there is ambiguity in the meaning of an exclusion as in any part of an insurance policy, it will be construed against the insurer. *See, id.,* citing, *Bianchi v. Automobile Club of Michigan,* 437 Mich. 65, 70, 467 N.W.2d 17 (1991); *M & H Tool Co., Inc. v. Aetna Casualty & Surety Co.,* 185 Mich.App. 571, 574, 463 N.W.2d 124 (1990).

The Securities Acquisition Exclusion in this case bars claims "based upon or attributable to any attempts ... to acquire securities of the Company against the opposition of the Company and/or the Directors of the Company" and claims "arising from, attributable to or involving" efforts by the Company or its Directors to resist such attempts. Thus lawsuits alleging that Rospatch directors were

trying to prevent the acquisition of control over Rospatch do not fit squarely into the exclusion. A claim is not "based on or attributable to" certain conduct unless that conduct is alleged. *National Union Fire Ins. Co. of Pittsburgh v. Continental Illinois Corp.*, 666 F.Supp. 1180, 1199 (N.D.Ill.1987). In this instance, the plaintiffs in the Consolidated Class Action and in *Atcovitz* alleged that Rospatch officers and directors had attempted to prevent third parties from acquiring *control* of Rospatch. Attempts by the officers and directors to prevent acquisition of Rospatch *securities* were not alleged. The claims do not, then, fall squarely within the Securities Acquisition exclusion to the 89/90 policy. Therefore, unless the acquisition of a corporation's securities is an exclusive prerequisite to gaining control of the corporation, this exclusion does not apply to these claims.

Only one case of which I am aware has directly addressed the construction of an insurance policy provision such as this one. In *KDT Industries, Inc. v. Home Ins. Co.*, 603 F.Supp. 861 (D.Mass.1985), the court construed an endorsement excluding claims "directly or indirectly arising from any attempt to gain control or from any gaining of control of the Company or any claim made by any minority stockholder of the Company." *Id.* at 862. The court found the provision ambiguous in that it combined references to attempts to control the company with references to claims by minority shareholders, without explaining the connection between the two. *Id.* at 867. "Given that the essence of the defendant's endorsement is 'control,' and further, that the words 'minority stockholder' are in no way segregated or specifically defined," the court wrote, "I find that the exclusion does not extend to all such claims." *Id.* It held that claims by the insured company for coverage of cases alleging self-dealing would not be excluded under the provision, in that the fundamental issue in those cases was fairness and not control. "Although control was an issue, it was only incidental in that it constituted an element of the plaintiff's burden." *Id.* at 869.

In this case, the allegations made in the underlying litigation are not so easily distinguishable from the claims which the Securities Acquisition language appears to exclude. Whether or not the allegations of attempts by Rospatch officers and directors to prevent third parties from gaining *control* of Rospatch assumed and encompassed allegations that they were attempting to prevent acquisition of Rospatch *securities* is not clear from the face of the complaints.

The court's narrow construction of the policy in *KDT* is instructive. Furthermore, "control" of a corporation has long been defined by legislatures, courts and the Securities Exchange Commission to be obtainable through a variety of means, and not necessarily to require ownership of a particular number of shares of the corporation's stock. Louis Loss and Joel Seligman, *Securities Regulation*, Vol. IV at 1703–1727 (3d ed. 1990). As Judge Cardozo wrote for the New York Court of Appeals in 1918, " 'A dominating influence may be exerted in other ways than by a vote.' " *Id., quoting, Globe Woolen Co. v. Utica Gas & Elec. Co.*, 224 N.Y. 483, 121 N.E. 378, 379–80 (1918). In the legislative history of the Securities Act of 1933, Congress defined " '[t]he concept of control' " as " 'not a narrow one, depending upon a mathematical formula of 51 percent of voting power, but broadly defined [to apply] wherever the fact of control actually exists.' " *Id.* at 1707, *quoting*, H.R.Rep. No. 85, 73d Cong., 1st Sess. 14 (1933). The Securities Exchange Commission has defined control as " 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *Id.* at 1708–09, *quoting*, Sec.Act Rule 405; Sec.Ex.Act Rule b–2; Trust Inc. Act Rule 0–2; Reg. S–X, Rule 1–02.

Construing the allegations in the underlying suits concerning the attempts by Rospatch directors and officers to prevent control of Rospatch by third parties in the light of these definitions, I find that the Securities Acquisition exclusion does not cover them. Those allegations cannot be interpreted as necessarily including assertions that Rospatch's officers and directors were attempting to prevent the purchase of its securities

by third parties who sought control of Rospatch. The third parties could have been seeking control by any of a number of means other than the purchase of securities. In accordance with this conclusion and with the general rule requiring construction of an ambiguous exclusion in favor of the insured, *see Fragner, supra,* and citations therein, I conclude that, as a matter of law, the Securities Acquisition endorsement does not prevent coverage of Rospatch's defense and settlement costs for the Consolidated Class Action and *Atcovitz.*

### Indemnification Requirement

■ American Casualty asserts that Rospatch has not met the indemnification requirement under Insuring Clause (b) of the 89/90 policy, and that this failure precludes it from recovering for any of its claims under that policy. Recovery of a Loss under the policy is provided for only where Rospatch "is required to indemnify, or ... has, to the extent permitted by law, indemnified the Directors and Officers" for the Loss. American Casualty alternatively maintains that whether or not the indemnification requirement was met is a fact question which cannot be resolved on summary judgment.

Rospatch's position on this issue is that while it did not formally indemnify its officers and directors for its losses in connection with the underlying lawsuits, it was required by law to indemnify them, and the absence of a formal indemnification is not grounds for American Casualty to deny it coverage. Having considered these assertions and American Casualty's opposition to them, I find that this issue raises questions of fact which preclude summary judgment.

American Casualty asserts that a formal indemnification was required as a prerequisite to recovery under this policy. In light of the language of the policy and relevant caselaw, however, that position is insupportable. The policy itself provides for coverage of claims for which Rospatch was required to indemnify its officers and directors, in addition to claims for which it had indemnified them. Thus, *Macmillan, Inc. v. Federal Ins. Co.,* 741 F.Supp. 1079 (S.D.N.Y.1990), cited by the defendant, is clearly distinguishable.

In that case, the insurance policy covered only "Loss for which the Insured Organization grants indemnification to each Insured Person, as permitted or required by law." *Id.* In other cases addressing this issue, courts have rejected the notion that settlements naming as payor the insured rather than its officers or directors were *per se* excluded from coverage where the policy required indemnification or an obligation to indemnify. *Wayne County Neighborhood Legal Services v. Nat'l Union Fire Ins.,* 971 F.2d 1, 4 (6th Cir.1992) ("The argument that for [the insured's employee] to be entitled to indemnification she must actually write the settlement check is unpersuasive"); *Harbor,* 922 F.2d at 366 ("it is a detail whether the director or officer first incurs an expense to a plaintiff which Continental then reimburses or Continental pays the plaintiff directly. The latter route is merely more direct; it cuts out the middleman"). Therefore, Rospatch's failure to formally indemnify the directors and officers involved in the underlying suits does not prevent it from obtaining coverage from American Casualty for those expenses.

■ Although Rospatch was not required to formally indemnify its officers and directors, the policy did require it to demonstrate that it was required by law to indemnify the officers and directors involved in the underlying suits. Rospatch's Articles of Incorporation and By-Laws provide for indemnification of its officers and directors for expenses incurred in connection with suits brought against them in their capacities as such, as long as they acted in good faith and in a way they reasonably believed to be in the interests of Rospatch. Whether or not an individual officer or director has satisfied the good faith requirements for indemnification and consequently has the right to indemnification, however, is for the Board of Directors to decide. Articles of Incorporation at Art. VII; By-Laws at Art. VI, § 4. While these provisions do allow for a court to decide that particular officers and directors have a right to indemnification, that assessment involves determinations as to the motivations of the directors and officers at issue

here, which this court is unable to make with the information before it.

In this case, Rospatch has supplied the court with information showing that its Board of Directors was preparing to indemnify the officers and directors involved in the underlying suits. Its Board of Directors established and funded an Indemnity Trust and amended the existing indemnity agreements with its officers and directors to reflect that action. Minutes of the Special Meeting of the Executive Committee of the Board of Directors of Rospatch Corporation (Aug. 13, 1990). *See also,* Minutes of the Ameriwood Industries International Corporation Board of Directors Meeting (March 10, 1992) (marking the Board's authorization of the executive officers of the Company to settle the underlying lawsuits). Rospatch has failed to show, however, that its Board made a finding that the officers and · directors had a right to indemnification, as required by the Articles of Incorporation and the By–Laws. Therefore a question of fact remains as to whether the directors and officers named as individual defendants in the underlying suits actually had a right to indemnification.

In construing a similar directors and officers liability policy, the Sixth Circuit recently held that whether the employee of an insured was entitled to indemnification was a mixed question of fact and law, and therefore not proper for summary judgment. *Wayne County Neighborhood Legal Services v. National Union Fire Ins.,* 971 F.2d 1 (6th Cir. 1992). *See also, Reliance Group Holdings, Inc. v. National Union Fire Ins. Co.,* 188 A.D.2d 47, 58, 594 N.Y.S.2d 20, 26 (App.Div. 1993) (citing cases and stating that "the rather sparse caselaw addressing the question of an officer or director's entitlement to indemnification for defense costs under a D & O policy appears to favor its treatment as a factual question to be determined by a jury"); *PepsiCo v. Continental Casualty Co.,* 640 F.Supp. 656 (S.D.N.Y.1986).

In sum, the question of whether or not the individual officers and directors named in the underlying suits have a right to indemnification by Rospatch is a factual issue for a jury. Summary judgment is therefore denied as to any of the claims under the 89/90 policy, subject to determination of this issue.

## VII. ALLOCATION ISSUE

■ A final issue raised by American Casualty in opposition to Rospatch's motion for summary judgment is that of the allocation of Rospatch's settlement and defense costs in the underlying suits. As stated above, Rospatch claims it spent a total of $15,623,500 for the settlements of the Atlantis fraud suit and the Consolidated Class Action (*Plato Paper* and *Freberg* ). Subtraction of the fair market value of the shares · Rospatch received from Atlantis as part of the settlement reduces the total to $8,161,000. In addition, Rospatch claims it has incurred $7,100,000 in defense costs for all of the claims under the D & O policies.

Rospatch asserts that all of its liability in the underlying lawsuits derived from the alleged wrongful acts of the officers and directors named as defendants in those suits. Therefore, it argues, this court can, as a matter of law, allocate all of Rospatch's liability to its officers and directors and hold all of its claims to be covered under the policies in question. American Casualty maintains that these allocation questions should be decided with the damages issues in this case, and that they are irrelevant to Rospatch's summary judgment motion.

Several issues of allocation exist in this case. What portion of Rospatch's costs is attributable to its own corporate liability as opposed to that of the individual officers and directors? Of Rospatch's liability, what portion is derivative of its officers' and directors' liability and recoverable under the policy? What part of the claimed damages is assignable to individual defendants not covered by the policies? What portion is attributable to claims not covered under the policies because they were filed after the end of the 89/90 policy? These are mixed questions of fact and law which cannot be decided on summary judgment. In addition, they need to be reserved until after the liability issues in this case have been entirely resolved. In *Harbor,* 922 F.2d at 368, the Seventh Circuit Court of Appeals held that decision of the allocation issue depended upon establishment of the

insurer's liability for the claims of the insured. In *Nodaway Valley Bank v. Continental Cas. Co.*, 715 F.Supp. 1458 (W.D.Mo. 1989), the court reached the allocation issue only after summary judgment had been granted on the issue of liability. *Id.* at 1459. Thus, summary judgment is denied on the issues of loss allocation between Rospatch the corporation and its individual officers and directors, among individuals covered and not covered under the policies, and among claims covered and not covered under the policies. These questions will be reserved for decision with the other damages issues in this case.

## VIII. CONCLUSION

In sum, there is no coverage for any of Rospatch's claims under the 88/89 policy for the reasons stated above. Similarly, no coverage exists for Rospatch's disbursements and costs associated with the Atlantis fraud lawsuit and claimed under the 89/90 policy. Therefore, summary judgment is denied as a matter of law as to those claims.

With respect to its claims for coverage of the Consolidated Class Action and *Atcovitz*, there remains no dispute that claims were made within the policy period for Wrongful Acts by the officers and directors. Furthermore, neither of the exclusions cited by American Casualty prevent coverage of Rospatch's costs associated with those two actions. Unresolved factual questions, however, prevent summary judgment as to American Casualty's liability for these two claims. Specifically, questions of fact remain as to whether or not Rospatch was obligated to indemnify its officers and directors, as is required for coverage under the policy, and as to the correct allocation of Rospatch's losses. Remaining to be decided in this case then, are these two questions, upon which a final determination as to American Casualty's liability for the Consolidated Class Action and *Atcovitz* claims depends, and the damages issues.

## ORDER

In accordance with the opinion filed this date,

IT IS ORDERED that defendant's motion for summary judgment is granted in part and denied in part.